RAYBESTOS–MANHATTAN, INC., Joseph N. Kuzmick, and John B. Littlefield, Plaintiffs,

v.

Edward J. BRENNER, Commissioner of Patents, Defendant.

Civ. A. No. 1718–64.

United States District Court
District of Columbia.

June 17, 1965.

Maxwell James, James & Franklin, New York City, Ben Cohen, Washington, D. C., for plaintiffs.

Joseph Schimmel, Deputy Sol., Washington, D. C., for defendant.

JACKSON, District Judge.

This civil action was heard on January 4, 1965, and the Court having considered all the evidence presented, including the record in the Patent Office and the argu-

ments of counsel, entered judgment for plaintiffs.

In accordance with the Federal Rules of Civil Procedure, Rule 52(a), 28 U.S.C., the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiff, Raybestos-Manhattan, Inc., is a New Jersey corporation, having a principal place of business at Passaic, New Jersey. Plaintiffs Joseph N. Kuzmick and John B. Littlefield are citizens of the United States and residents respectively of Clifton, New Jersey, and Monsey, New York.

2. Defendant is the Commissioner of Patents.

3. This action arose under the patent laws of the United States pursuant to the provisions of Section 145, Title 35 U.S. Code, and is based upon the refusal of the Commissioner of Patents to grant Letters Patent to the plaintiffs-inventors Joseph N. Kuzmick and John B. Littlefield upon an application for Letters Patent, Serial No. 822,831, filed by them on June 25, 1959, and assigned to the plaintiff Raybestos-Manhattan, Inc.

4. During the prosecution in the Patent Office the Examiner finally rejected claims 20, 21, 22, 23 and 24 of the application, the only claims remaining. An appeal was taken to the Board of Appea's of the United States Patent Office which, in a decision rendered on June 12, 1964, refused to allow the claims. Upon that refusal, the plaintiffs brought this action in accordance with the provisions of Section 145, Title 35, of the United States Code.

5. The invention at issue relates to a molded composition brake shoe for railroad rolling stock. Railroad composition brake shoes are known in which an organic heat-softening bond, usually comprised of a mixture of synthetic rubbers, and synthetic resins, such as cashew nut shell liquid resins, are compounded with hard mineral particles such as iron filings. The hard mineral fillers function to impart to the molded composition shoe a wet to dry friction ratio approaching unity.

Under high energy operation, where wheel tread temperatures reach 800°—1000° F. and where interface temperatures exceed 2000° F., this composition causes the rate of wear on the railroad wheel to become excessive, and even to exceed that of the conventional iron brake shoe, which has been used for many years for braking railroad rolling stock. Wear on the wheel tread has become of concern because it is more difficult and expensive to replace wheels than to replace brake shoes.

6. The object of the Kuzmick and Littlefield invention is to make a composition railroad brake shoe possessing a wet to dry friction ratio of nearly unity, a uniformity of friction over the range of operating temperatures normally encountered in service, and a marked reduction in wheel tread wear, thereby increasing the tread life of the railroad wheels.

7. The heat softening organic bond ratio employable in composition brake shoes is in the range from a little below 20% to a little above 30% (generally from 15% to 32%) by weight of the shoe composition. It is possible to obtain good wheel life in composition shoes which contain hard mineral filler particles and an organic bond in a weight proportion of over 25%. This is done, however, at the expense of causing poorer heat stability, which results in a wider than the desired range of friction with operating temperatures and a poorer structural strength. Thus, at the middle and higher bond levels, good wheel wear is obtainable at low temperature conditions, but if the shoe is involved in high energy stops or drags, the high ratio bond will soften and the shoe will squash out and may even catch fire. If the bond is in the low part of the range (below 25%), better shoe wear is obtained at the temperatures met with in service, and the shoe is characterized by high wheel tread wear.

8. To solve the involved problems, Kuzmick and Littlefield, in the invention before the Court, compounded the heat softening bond and hard mineral fillers with cryolite (sodium fluoaluminate).

The organic bond, the hard mineral filler and the cryolite together comprise the essential and major ingredients by weight of the composition. The cryolite is added in a proportion less than that of the organic bond or the hard mineral filler, and is effective to impart improved wheel tread life to the brake shoe. Critical proportions of these three ingredients in the composition of the invention are: organic bond in the proportion of 15% to 32% by weight of the composition, hard mineral filler in the proportion in the range of 30% by weight of the composition, and cryolite in the proportion of 5% to 15% by weight of the composition.

9. The results attained by the making of the composition with the cryolite addition are as follows:

(a) In a composition having a low bond content (of less than 25%) a composition shoe is obtained which produces a marked reduction in wheel wear, improving it by more than 100% over known brake shoe compositions. The shoe of the invention otherwise possesses the desired properties of a wet to dry friction ratio approaching unity, a uniformity of friction over the range of operating temperatures encountered in service, and structural strength and stability. Since, as noted, known composition shoes having a low bond ratio have better shoe wear (but very high wheel wear), the additive use of the cryolite permits making the composition with the use of the organic bond in the (more desirable) low range without the accompanying high wheel tread wear. It was demonstrated that with a low bond ratio composition of the invention in suit, (i. e. employing cryolite) the wheel tread wear is less than one half of that of competitive shoes on the market, whether the latter has a high bond ratio or a low bond ratio, and

(b) The addition of the cryolite to the shoe composition using a higher organic bond content (over 25%) also substantially reduces the tread wear of the contacted wheel. As noted, in high bond ratio compositions, good wheel tread wear is normally attained, but this is at the expense of poorer shoe life and stability. However, even with the high bond ratio compositions of the present invention, substantial improvement (due to the cryolite addition) in wheel tread wear is attained. It has been demonstrated that a high bond ratio composition of the invention (i. e. employing cryolite) has a wheel tread wear improvement of over 50% when compared to the wheel tread wear of competitive shoes, whether the latter has a high bond ratio or a low bond ratio.

10. The brake shoe composition of the invention has met with substantial commercial success, is being sold extensively by the division of the American Steel Foundries, Inc. as the "Anchor" shoe, and is being used as a brake shoe by many railroads in the United States and Canada on freight cars, passenger cars, locomotives and rapid transit equipment.

11. It has been demonstrated by the testimony of the witnesses adduced at the trial, given with reference to several types of brake shoe compositions, some with and some without cryolite, compounded and tested by the plaintiffs and the American Steel Foundries in the laboratory and by operational tests on passenger trains, over a period of years, that the addition of cryolite to the composition of the brake shoe does produce the results set forth in the specification and claims.

12. The claims do not merely call for the addition of cryolite to a broadly claimed conventional brake shoe.

The broader claims, namely, claims 20, 22 and 23 call for a specific heat-softening bond, a specific class of hard mineral

filler, and the addition of cryolite. They further specify, however, that with the organic bond, hard mineral filler and cryolite comprising together the essential and major ingredients by weight of the composition, the cryolite is in a proportion less than that of the organic bond or the hard mineral filler, and is effective to impart improved wheel tread life to the brake shoe.

Claims 21 and 24, embracing all that is in claims 20 and 23 respectively, are specific to the critical ranges and proportions of the three ingredients and recite that the organic bond is in the proportion of 15% to 32% by weight of the composition, the hard mineral filler is in the proportion in the range of 30% by weight of the composition, and the cryolite is in the proportion of 5% to 15% by weight of the composition.

13. The prior art cited by the Patent Office on which it based its rejection under 35 U.S.C. § 103 are United States patents to deGaugue 2,686,140 (August 10, 1954), Spokes and Littlefield 2,901,-456 (August 25, 1959), Newman et al 2,-669,485 (February 16, 1954), and a publication entitled "Cryolite" by the Pennsylvania Salt Mfg. Company. The primary references are deGaugue and Spokes, which relate to railroad brake shoe compositions; the secondary references are Newman and "Cryolite", which mention the use of cryolite in various other compositions.

14. The deGaugue patent describes a railroad brake block composition made from an organic bond (of a rather high bond content) and a hard mineral filler, similar to those of the composition of the present application, but the composition does not contain cryolite. The testimony at trial showed that comparative tests, made on shoes represented to be those embodying the composition of the deGaugue patent, demonstrated that wheel tread wear caused by the brake shoes of the present invention was only one-half as much as that of the deGaugue shoe. Other performance tests showed that both compositions had good frictional and shoe wear characteristics, except that at very high temperatures with numerous stops, the brake shoe of the present application was able to maintain its friction level, whereas the competitive shoe did suffer some loss of friction throughout this series of stops. The tests comparing the wheel tread wear of brake shoes of the present invention having a bond content in the high range with the deGaugue shoe showed that the wheel tread wear of the plaintiffs' shoes was more than a 50% improvement over the wheel tread wear of the other shoe.

15. The Spokes and Littlefield patent, also to a composition brake shoe for railway equipment, comprises an organic bond (of a low bond content) and hard mineral fillers, similar to those of the composition of the invention in suit, but does not contain cryolite. Testimony at trial showed that comparative tests revealed the wheel tread wear of the Spokes-Littlefield brake shoe was approximately twice as much as that of the brake shoes of the present invention. As to the other shoe characteristics, except for wheel wear, both shoes appeared to be similar in shoe wear rate, friction level and resistance to heat fade or deterioration.

16. The Newman et al patent, a secondary reference relating to a roller skate wheel, deals with an entirely different product and purpose. The composition of this patent, which has a high weight content bond (about 60 to 70%) and wood flour as the main filler, is not really comparable to railroad brake shoe compositions. The cryolite in the composition of this patent is used to prevent the creation of a static electric charge on the person of the skater. Thus, it has a purpose and function foreign to that of the plaintiffs' invention. There is no suggestion in this patent that its teachings could be combined with those of either of the main references to provide the advantage the plaintiffs' invention is designed to achieve.

17. The Penn Salt publication, which is a brochure entitled "Cryolite", suggests the use of cryolite for abrasive wheels, and also as a "friction stabilizer in heavy

brake blocks". The Patent Office Board of Appeals, in referring to the latter suggestion, deemed the suggestion of use in heavy duty brake blocks to include brake blocks for breaking heavy railway equipment.

18. The statement in the Penn Salt publication that the use of cryolite in abrasive wheels (grinding wheels) is "to impart longer wheel life" is contrary in its meaning to the purpose of the use of cryolite in a railroad brake shoe of the plaintiffs' invention. In the former, it is the composition product, the grinding wheel, that wears longer due to the cryolite addition—the function of a grinding wheel being to wear away the surface contacted, the metal being ground. In the plaintiffs' invention, cryolite is added to *prevent* grinding away of the surface to be contacted, the train wheel. While the cryolite in abrasive wheels naturally fuses at high temperatures and acts as a secondary bond, as it does in the compositions of the present invention, the *effects* of the cryolite and the results achieved are opposites. In abrasive wheels, abrasive grains are bonded by a heat-hardened phenolic bond. According to the publication, however, when the cryolite melts it causes a "release of abrasive grains, giving additional sharp edges". This release is opposite to the effect of the fusion at high temperatures of the cryolite in applicants' brake shoe composition. According to the specification, "it (the cryolite) * * * wets the hard mineral particles and holds them tightly so that they do not as readily become free to roll and slide between the shoe and wheel tread surfaces." Thus, the underlying concept, function, and result of the use of cryolite in a railroad brake shoe are not the same as those of the use of cryolite in a grinding wheel.

19. The "heavy brake block" mentioned in the Penn Salt publication apparently is a truck brake block or a bus brake block. The composition of such brake blocks ordinarily consists of a two-step or one-step phenol formaldehyde resinous heat hardening bond and a filler comprised mostly of asbestos. This is different from the hard mineral filler and heat softening bond of plaintiffs' railroad brake shoes. In the "heavy brake blocks", friction stabilizers are added to act as absorbents to prevent the breakdown of the hard phenolic bond. One material commonly used for the purpose is litharge (lead oxide). During the war, with litharge rationed, cryolite was substituted for litharge to act as a friction stabilizer. While litharge and cryolite may be mutually substituted for the purposes of truck or bus brake blocks, litharge is not a substitute for cryolite for the purposes of plaintiffs' railroad brake shoe composition because litharge does not function like cryolite to effect the reduction in railroad wheel tread wear. The term "friction stabilizer" means an additive which maintains the friction more nearly uniform over a wide temperature range. That function has no relation to that of improving wheel wear in a railroad brake shoe. In the latter, the friction range is just as uniform without the use of cryolite. Therefore, the concept, function, and result of the use of cryolite in heavy brake blocks are different than those of the use of cryolite in a railroad brake shoe.

20. As the evidence accumulated at the trial, it became clear that it would not have been obvious to combine the suggestions contained in the Penn Salt publication with the teachings of the main references to produce the plaintiffs' invention.

21. The plaintiffs' invention was evolved only after many months of experimentation and testing under both laboratory and railroad field conditions. Numerous brake shoe compositions were tried in the search to find one which achieved the desired reduction in wheel tread wear. None save the one containing cryolite proved effective. The history of the making of the invention indicates that the subject matter sought to be patented would not have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertained (35 U.S.C. § 103).

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this action.

2. The differences between the subject matter sought to be patented in claims 20, 21, 22, 23 and 24 and the prior art are such that the subject matter as a whole would not have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains.

3. Claims 20, 21, 22, 23 and 24 define a novel and patentable product combination.

4. Plaintiffs are entitled to a patent containing claims 20, 21, 22, 23 and 24.